## KANSAS CITY LIFE INS. CO. v. ELMORE.*
### (No. 2017.)

(Court of Civil Appeals of Texas. Amarillo. March 14, 1923. Rehearing Denied April 4, 1923.)

1. Insurance ⊂⇒76—Bank held authorized to collect premiums under life policy, although not having official receipts.

In a suit by an insurance company against a beneficiary to restrain a collection under a life policy claimed to have been forfeited for failure to pay premiums, the policy providing that premiums should be payable in advance, and that they might be paid to an authorized agent, but only in exchange for a receipt signed by the president, vice president, secretary, or assistant secretary of the company, and countersigned by agent, and it appearing that the premiums had been paid to a bank, but no receipts taken in exchange, evidence *held* to show that the bank was authorized to collect premiums, although it did not have official receipts.

2. Banks and banking ⊂⇒90—Transaction between bank collecting premiums and insurer after insured's death held competent as to agency.

In a suit by an insurance company to restrain the beneficiary from collecting under a life policy claimed to have been forfeited for nonpayment of premiums, the authority of the bank to which premiums had been paid to collect them being in issue, proof of transactions between the bank and insurer after the death of insured *held* competent to show agency.

3. Principal and agent ⊂⇒175(3)—Ratification relates back.

As between the parties, ratification of an agreement relates back to the time when it was made.

4. Insurance ⊂⇒349(1)—Death of insured held to have occurred within period of grace provided for in life policy.

Where a life insurance policy issued December 21, 1917, provided that premiums should be paid annually in advance, and that one month's grace, without interest charge, should be given for the payment of all annual premiums except the first, and insured died January 6, 1919, *held*, that the policy was in force at the time of insured's death, by virtue of the provision for grace.

Appeal from District Court, Lipscomb County; W. R. Ewing, Judge.

Suit by the Kansas City Life Insurance Company against Edna R. Elmore, for an injunction. Judgment for defendant, and plaintiff appeals. Affirmed.

Hoover, Hoover & Willis, of Canadian, for appellant.

Adkins & Kimbrough, of Amarillo, W. H. Sewell, of Lipscomb, and E. C. Gray, of Higgins, for appellee.

KLETT, J. The appellant, Kansas City Life Insurance Company, as plaintiff below, sought an injunction in the district court of Lipscomb county, for the purpose of restraining defendant, Edna R. Elmore, from attempting to collect, as beneficiary, an installment policy of life insurance issued to her husband, Benjamin F. Elmore. The company claimed the policy was forfeited for failure to pay the second annual premium. The defendant answered, and asked for judgment on the matured installments, alleging that the policy provided for the payment of the insurance in 240 monthly installments of $25 each. The defendant alleged payment of premium, waiver, and estoppel. Judgment was rendered in favor of the defendant upon the special findings of a jury. The record is substantially the same as that reported on the former appeal of this case, except as to some amendments to the pleadings suggested in the decision. See Kansas City Life Insurance Co. v. Elmore, 226 S. W. 709.

The company pleads that the policy was "issued" on December 21, 1917, and in detailing the nature of the contract alleges:

"That said policy was issued in consideration of the promise of payment by the insured of the annual premium of $77.52, for one year's term insurance from the date of said policy, with the provision that the policy should be continued upon further payment of a like amount on or before the 1st day of December of each year thereafter during the continuance of said policy; that by said policy it was provided that all premiums subsequent to the first premium should be due and payable in advance at the home office of the company, without notice, with the further provision that such premiums might be paid to an authorized agent of the company on or before the date when due, but only in exchange for a receipt signed by the president, vice president, secretary or assistant secretary of the company, and countersigned by such agent, and that, upon failure to pay a premium on or before the date when due, the policy should become null and void without any action or notice by the company, and all rights thereunder should be forfeited to the company, except as otherwise provided in the policy, after such policy had been in force for three years; that said policy further provided for grace of one month (without interest charge) for the payment of all premiums except the first during which the insurance would remain in full force."

These allegations are not disputed, except that defendant says the insurance was for life instead of for one year. The defendant pleads that the second premium was paid to the Laverne State Bank of Laverne, Okl., on December 28, 1918, and that, although the policy does not permit payment to an agent except upon delivery of a receipt signed by one of the officers designated in the policy, this provision was one for the benefit of the company, which could have been waived, and was waived, by the conduct of the company in permitting said bank

to collect renewal premiums without being in possession of the official receipt mentioned.

The company's principal office is located in Kansas City, Mo. Eugene Arnett, as the company's state agent for Oklahoma, gave one J. P. Compton a contract to write insurance for the company. Compton was cashier and N. T. Stewart assistant cashier of the Laverne State Bank of Oklahoma. The company consented to deposit with the bank a certain percentage of renewal premiums, for which the bank issued certificates. From time to time, beginning in 1917, the company accepted from the bank certificates of deposits, issued in favor of the company, for renewal premiums, which the bank had collected without delivering the premium receipts, but on September 5, 1917, wrote the bank it could not "accept further payments of renewal premium on this basis for the present time." On December 28, 1918, the bank sent the company a "time" deposit slip covering payment of Elmore's second annual premium, and about the same time sent similar certificates to cover renewal premiums on policies held by Spicer and Adams. It is not shown when the certificate of deposit covering the Elmore premium was received by the company, but there is evidence tending to show that it reached the company on or before December 31, 1918. On January 8, 1919, the company returned to the bank the three certificates of deposit mentioned, stating that, "as advised on several previous occasions, the company cannot accept certificates of deposit in payment of premiums," but instructed the bank to "please forward the usual medium of exchange in payment of these several items," and at the same time saying to the bank, "Permit us to call your attention to the agreement made through the Oklahoma Agency some months ago to the effect that all remittances be made direct to the home office as premiums are collected by you." About January 16, 1919, the bank sent the company new certificates; and on January 21, 1919, the company wrote the bank that it had received the certificates changed to read, "On demand," and would accept the certificates covering the Spicer and Adams premiums, although the Adams premium was due December 9, 1918, but stated it would not accept the certificate covering the Elmore premium because Elmore's death had occurred prior to the time the certificate was returned to the bank. There was also other correspondence, to which we may refer later.

[1] The principal question involved is whether or not the evidence is sufficient to sustain the finding of the jury to the effect that the bank was authorized to collect insured's renewal premium without being in possession of a receipt signed by one of the officers named in the policy. A careful review of the record leads us to the conclusion that we would not be justified in disturbing the verdict. As early as July, 1917, the company accepted certificates of deposit in payment of premiums collected by the bank when the bank did not have official receipts. On September 5, 1917, the company again wrote the bank it was accepting certificates of deposit covering three renewal premiums "recently collected by your good bank." C. N. Sears, secretary of the company, admitted that at the time the bank made the collection mentioned it did not have possession of the premium receipts. In the letter of January 8, 1919, the company called to the attention of the bank the "agreement" with reference to the manner of remitting premiums "collected by you." And again on January 21, 1919, the company wrote the bank it was inclosing "renewal receipts" covering premiums collected by the bank and remitted to the company, in the form of certificates of deposit. The remittance on the Adams policy did not reach the company until after the period of grace expired, although collected by the bank before the end of such period. It is to be observed that in some of the letters the company refers to "collections made by the bank." It is manifest that the bank was making the collections for the company, and for no one else. The bank was serving as a collector, and in that capacity acting as the company's agent. It is true that in more than one letter the company complained of the bank's maner of making remittances, but not one time did it deny the authority of the bank to make the collections. In fact, all remittances, except the one covering Elmore's premium, were received by the company, proper credit given on the books, and the continued validity of the policies recognized. It seems such conduct on the part of the company is strongly indicative of its recognition of the authority of the bank to collect premiums without having a receipt signed by one of the officers of the company, and therefore adhere to the ruling of this court in disposing of this question on the former appeal.

[2] The company questions the admissibility of proof of what was done after the death of the insured, insisting that no acts or statements thereafter made by the officers of the company could revive the policy. As we understand it, the evidence was admitted on the issue of agency, and we think was competent for that purpose. The acts are clearly connected in time and related in character, thereby showing a course of dealing tending to prove that the company recognized the bank as its agent. Mechem on Agency, vol 1, §§ 262, 263.

[3] Plaintiff excepts to the sufficiency of defendant's answer because it is not shown that the Oklahoma agreement, authorizing the bank to collect premiums, was made on behalf of the company by one of the officers enumerated in the policy. We think the pleading is not subject to the objection in view of the fact that the defendant avers

that the agreement was ratified by C. N. Sears, secretary of the company. As between the parties the ratification of the agreement related back to the time when it was made.

[4] We also entertain the view that this case should be affirmed on the theory that, even though the second annual premium was not paid, the insured died during the period of grace. According to the company's pleadings the insured died within 13 months after the issuance of the policy. The company alleges that the policy was issued December 21, 1917, and that insured died January 6, 1919. In the absence of the evidence to the contrary, it is presumed the contract of insurance took effect at the time it was issued, and that the payment of the first annual premium gave the insured 13 months' insurance, where the policy provides for one month of grace. The payment of the first annual premiums paid for 12 months insurance, which did not expire until December 21, 1918, because the insurance did not begin until December 21, 1917. Certainly the company cannot deny to the beneficiary the one year's insurance that the insured paid for, and, according to the policy, the insurance could not be forfeited for a period of one month thereafter. Hence we conclude that the insured died while the contract was still in force. McMaster v. New York Life Insurance Co., 183 U. S. 25, 22 Sup. Ct. 10, 46 L. Ed. 64; State v. Allen (Mo. Sup.) 243 S. W. 839.

In McMaster v. New York Life Insurance Co., supra, the policy was dated the 12th but issued the 18th of December, 1893. The policy provided for the payment of the annual premiums on December 12th, and also allowed one month's grace. The insured died January 18, 1895. The Supreme Court of the United States held:

"And if not in force until December 18, the date actually issued, how can it be said that liability to forfeiture accrued before the twelve months had elapsed? The truth is the policies were not in force until December 18, and as the premiums were to be paid annually, and were so paid in advance on delivery, the second payments were not demandable on December 12, 1894, as a condition of the continuance of the policies from the twelfth to the eighteenth. And, as the policies could not be forfeited for nonpayment during that time, the month of grace could not be shortened by deducting the six days which belonged to McMaster of right. In our opinion the payment of the first year's premiums made the policies nonforfeitable for the period of thirteen months, and inasmuch as the death of McMaster took place within that period, the alleged forfeiture furnished no defence to the action."

The case was also tried and presented to the jury on other theories of waiver and estoppel, but, according to the views announced on this and the former appeal, such questions become immaterial, rendering it unnecessary to pass on appellant's other assignments.

The judgment of the trial court is accordingly affirmed.

